# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

*David E. Patton*
Executive Director
*and Attorney-in-Chief*

*Southern District of New York*
*Jennifer L. Brown*
Attorney-in-Charge

September 6, 2023

**VIA ECF**

The Honorable J. Paul Oetken
Southern District of New York
40 Foley Plaza
New York, NY 10007

**Re:**   **United States v. Mariah Jaquez**
          **21 Cr 190-3 (JPO)**

Dear Judge Oetken:

Mariah Jaquez was the victim of a cunning and sophisticated predator—her co-defendant Johnny Roman—who coerced and manipulated her into creating child pornography over the course of a few hours in October 2020. Mariah was nearly a minor herself—18 years old—and had a "long history of overlapping childhood traumas, ███████████████, poor judgment, ███████████████, and lack of coping skills" that made her especially vulnerable of being a victim of Mr. Roman's crimes. Ex. A at 2 (Dr. Cynthia Calkins's psychosexual evaluation).[1] Those hours completely broke Mariah and changed her life forever: she lost her son, her partner, and ███████████████████████ that took years to stabilize.

Mariah went to the police the next day. She filed two police reports, voluntarily gave her son to his father, and she has not seen him since. In the three years that have passed, she has matured considerably despite continued struggles with homelessness, poverty, and ███████████. She has made strides to process the trauma she has experienced and build a future for herself with her two younger children, both born during the pendency of this case.

---

[1] Dr. Cynthia Calkins is a Professor of Psychology at John Jay College of Criminal Justice. She has published several books and 80 articles in the area of sexual violence. Her C.V. is attached as Exhibit B.

Mariah stands before this Court having pled guilty to one count of possessing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2). Mr. Roman has also pled guilty, admitting he manipulated hundreds, if not thousands, of young women and girls to produce similar material. Considering Mariah's history and the unique allegations here, there is only one appropriate sentence: time served. Mariah is not a sexual predator. A prison sentence is not necessary to punish or deter her from further criminal activity—she has demonstrated during her long period of pretrial supervision that she is not a danger to anyone—adult or child. The collateral consequences of Mariah's sex offense are already more than sufficiently punitive. To send her to jail would disrupt—and potentially destroy—the progress she has made to date and would be devastating to her two younger children.

## <u>Mariah's Traumatic Childhood</u>

Mariah was born on December 26, 2001, and she is now 21 years old. Presentence Investigation Report ("PSR") at 3. Mariah's mother used cocaine, marijuana, and alcohol while pregnant, exposing Mariah to harmful toxins while in utero. Ex. A at 3; PSR ¶ 99. Her early childhood was a nightmare. Records reveal that Mariah and her siblings "were not bathed, did not attend school, and were not given clothing or food." Ex. A at 3. She was physically abused by both parents, resulting in New York City Administration for Children's Services ("ACS") removing her from their home when she was six years old. <u>Id.</u>; PSR ¶ 99. ███████████████ ██████████████████████████████████ Placed in foster care, Mariah did not find comfort—she bounced around between temporary homes, was treated poorly, and was beaten by her foster families. Ex. A at 3. The beatings often occurred simply because Mariah and her sister "wanted to eat or use the bathroom." <u>Id.</u> at 6.

Mariah remembers "hating" her childhood and "always being treated badly," but she has also suppressed some of this trauma, as she has tried to "forget things" that she really did not "want to remember." <u>Id.</u> at 3, 6. Sometimes, however, she has "flashbacks" which cause her significant distress. <u>Id.</u> at 3. Mariah's 18-year-old sister Angielisa writes "Mariah and I grew up in and out of foster homes and staying with different relatives. I was too young to remember all of it, but I would say they were terrible years." Ex. C at 1 (Letter from Angielisa Jaquez). Angielisa writes that they only had each other and Mariah "had to be like [her] mom" even though she was only a few years older. <u>Id.</u>

In 2008, Mariah and her sister went to live their paternal aunt who became their guardian and adopted mother. PSR ¶ 100. Her aunt Yohanny remembers when Mariah arrived in her home: "She was abused and ████████████████████

████████ That has caused a lot of trauma." Ex. D at 1 (Letter from Yohanny Jaquez). Angielisa recalls that "there were lots of other kids in the house" and the sisters "knew not to ask for things [they] couldn't have." Id. There was violence in their neighborhood, and Mariah once witnessed a drive-by shooting where the victim was killed. Id. ¶ 102.

Yohanny's home was unfortunately not a safe space for Mariah and her sister. They witnessed frequent domestic violence, including a horrific incident where her aunt was strangled by her boyfriend. Ex. A at 3; PSR ¶ 100. ACS records reveal that domestic violence was common in the home. Ex. A at 3. Mariah told ACS officials that she feared her aunt's boyfriend, as he often came home intoxicated and cursed at the children. Because of this violence, Mariah moved to various domestic violence shelters just as she was starting high school. Id.; PSR ¶ 100.

While Mariah was living in a shelter and entering high school, her mother was sick with cancer. At the time Mariah had no contact with her father, and her mother was very important to her. Her mother's cancer caused Mariah great stress and worry, and she suffered emotionally as she watched her mother decline. Id. ¶ 101. Mariah often skipped school to help care for her mother. Id. In May 2018, when Mariah was sixteen years old, her mother died. Id.; PSR ¶ 97. Mariah was devastated. She told Probation that her mother was "her safe space and best friend." Id. ¶ 101. Her sister writes that their mother's death "hit Mariah very hard." Ex. C at 1. She ran away from home and began missing more and more school. ACS records indicate that her caretakers caused "educational neglect" and that Mariah missed 71 days during her 9th grade year, the year her mother was ill. Ex. A at 4. The death of her mother came at a time when Mariah was already suffering, as she was forced to switch high schools as she moved around the shelter system. She was also fighting with her mother at the time, so she never got to say goodbye. This left Mariah feeling responsible for her mother's passing and a deep guilt that she still carries with her today. Id.

Around the time her mother became sick, Mariah began dating her first serious boyfriend. Soon after her mother died, Mariah became pregnant with their son. PSR ¶ 106. Prior to dating her son's father, Mariah did not have any sexual partners. In fact, before she sent pictures to Mr. Roman, her son's father was the only "boy," as she put it, who had ever seen her naked. As her pregnancy progressed and Mariah continued to mourn the death of her mother, she stopped attending high school in the tenth grade. Ex. A at 4; PSR ¶ 122. She moved into her boyfriend's family home and out of the shelter system. Her son ████ was born in late 2019. PSR ¶ 105.

Mariah's best friend Darielly Rodriguez writes that "Mariah never knew what love was until her child was born," Mariah "did everything for her baby." Ex. E (Letter from Darielly Rodriguez). In the year they spent together, Mariah doted on her son and worked hard to be a good mother. At the same time, her sister writes that it was challenging for Mariah. She was 17 when ███████ was born, and "she was the only one taking care of the baby all the time." Ex. C at 1. "Mariah felt like no one was there for her." Id. This feeling intensified when ███████ father moved to Georgia in the summer of 2020 to live with family and look for work. Mariah and ███████ then moved in with Darielly and her mother.

Mariah stayed with Darielly and her mother often until she was temporarily required to move back in with her aunt after her arrest in this case. Darielly and her family took turns babysitting ███████ and helped Mariah with money. Ex. E at 1. Mariah voluntarily enrolled in Youth Build's Pathways to Graduation Program in the hopes of earning her high school equivalency. See Ex. F. Youth Build provides vocational and educational training for youth "at the margins" in our community. Ex. A at 4. In her application, Mariah wrote that she was returning to school to earn a diploma so she could join the army and better her son's future. Id. Darielly's mom, Dionely, writes in her letter of support that Mariah "is a genuine person" who "tends to put others before herself." Ex. G (Letter from Dionely Lopez). Darielly and her family enveloped Mariah with love and she was comfortable and stable in their home. Unfortunately, this was not a permanent solution, and Mariah, her sister, and son continued to bounce around between residences.

### Mariah's Mental Health & Cognitive Functioning

Given all the trauma Mariah has experienced in her young life, it is not surprising she has struggled psychologically. ████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

During the course of this case, the defense hired Dr. Cynthia Calkins to review Mariah's medical records from her various hospitalizations and prior treatment and to conduct a battery of tests to determine her opinion as to an appropriate diagnosis. See generally Ex. A.

In the time Dr. Calkins spent with Mariah, she noticed that Mariah has poor eye contact and a tendency "to rock back and forth in a self-soothing manner." Ex. A at 7. This coincides with Darielly's view that Mariah has a hard time trusting people and making friends. See Ex. E at 1. She also struggles to engage with her past and the trauma she experienced, leading to Mariah feeling overwhelmed and helpless. Ex. A at 7. Mariah withdraws from life—after she was arrested, she was sleeping up to 14 hours a day to escape the pain of losing her son. Id. at 8. She also did not take great care of herself—in part due to her poverty—for example, she does not eat regularly. Id. Mariah has a limited vocabulary and shows "deficits in judgment and reasoning skills." Id. at 9.



Dr. Calkins believes Mariah is unique in that while many "experience a single adverse childhood experience," Mariah experienced many "multiple and overlapping adverse childhood experiences." Id. at 12. As a result, even though she at times may appear hardened, Mariah is "in reality a very wounded and traumatized young woman who sometimes shuts down and sometimes acts out, likely due to fear of rejection, hopelessness, and feelings of abandonment." Id. She was not taught and therefore does not maintain the coping skills needed to deal with the level of trauma and toxic stress she has endured. Id.

Mariah's history of trauma, her loneliness, psychological challenges, and cognitive limitations all came into play in October 2020 when the offense conduct occurred in this case.

## Offense Conduct

In October 2020, Mariah was living between her aunt's home and best friend's apartment. She was sleeping on couches with her one-year-old son while her baby's father was in Atlanta looking for work. She was upset that he was no longer in New York, and she had less than 20 dollars to her name. Her aunt told her that she was planning to disconnect her phone. Mariah needed supplies for their son and "she didn't have any money of her own, and that stressed her out." Ex. E at 1.

On October 2, Mr. Roman, posing as a woman named "Ashley Banks" messaged Mariah on Facebook Messenger offering her a job. PSR ¶ 32. Mr. Roman pretended to be a friend of a friend and told Mariah there was money to be made by texting with a "rich white older guy that pays to text girls on the low cause he married basically." "Ashley" worked to make Mariah feel at ease, telling her that "the boss" could help her get an apartment because he owns a few buildings. Mariah asked "Ashley" if she was in the Bronx because, in her words, she wanted "new friends." PSR ¶ 32.

Mariah was desperate for money and was curious. "Ashley" instructed Mariah to download Kik, a secure messaging platform, and to follow the instructions from "theboss12189." Id. Mariah did as she was told and began communicating with "the boss"—also Mr. Roman.

The messages between Mr. Roman and Mariah are not preserved. However, over the next few hours, Mariah sent him several photos and videos. She did so believing that she would be paid thousands of dollars. Defense counsel viewed the videos at the FBI office in Manhattan. It is clear that Mr. Roman was giving Mariah explicit direction in the unpreserved messages. The videos and photos begin with Mariah sucking her own finger or licking her breast and with Mariah placing a black heart emoji over her face so she is not identifiable in the photos. After those initial pictures, Mr. Roman must have directed Mariah to remove the heart because the next pictures included Mariah's face with her showing her breasts and sucking her own nipple. At this point, according to Mariah, Mr. Roman noticed her one-year-old son in the background, and he requested that she include him in the photos. When she refused, Mr. Roman began threatening her.

Mr. Roman told Mariah that if she did not continue taking photos with her son, he would expose the nude images she had just sent him on publicly available webpages and applications and intimated that he would harm her and her child if she did not comply. Mariah was terrified. She is a very private person, and the thought of her nude photos publicly available on the internet was too much for her to take. She proceeded to video tape herself kissing her son, breastfeeding him, sucking his finger, and then performing oral sex on him for several seconds. PSR ¶ 33. As soon as she was done, Mariah was "disgusted" with herself, terribly afraid, ████████ ████████████████

The next day, Mariah was distraught. Her sister recalls Mariah "crying hysterically" and "panicking" in the bathroom. Ex. C at 1. Mariah told her sister that a man had threatened her and her son. Id. Mariah also expressed her fears to her best friend, Darielly. Ex. F at 1. The threats continued to the next day. "Ashley" texted Mariah:



At that point, Mariah deleted her Facebook account and went to the police station to file a report. PSR ¶ 35. She told the officers about the threats from the night before as well as the ones made by "Ashley" on Facebook. Beyond going to the police Mariah also reached out to her son's father to ask him to take their child because she was afraid for his safety.

Five days later, after closing her social media accounts, Mariah received three text messages from unfamiliar numbers in short succession, repeating the same threats:



Mr. Roman wanted more from Mariah and when she was unwilling to continue taking photos, he continued to threaten her. Minutes later, Mariah went to the police station a second time to file a report. PSR ¶ 36. She also reached out to her son's father asking him to return to New York as soon as possible. She told him that while the "baby means the world to me and is the only person I love on this earth right now," she wanted his father to take him and not come back. Less than a week later, her son was on his way to Georgia to live with his father's family. Mariah has not lived with him since. Mariah felt both guilty and disgusted and "at her lowest point" in her life. Ex. A at 7,9.



Dr. Calkins believes that Mariah is being truthful, given that Mariah does not attempt to present herself in a socially





    Three weeks later, Mariah was arrested and charged with production and possession of child pornography. <u>United States v. Jaquez</u>, 21 Cr 190, ECF No. 1 (S.D.N.Y. Oct. 27, 2020). Mr. Roman was arrested on December 22, 2020. PSR ¶ 21. Over the course of its investigation, the Government learned that Mr. Roman attempted to coerce more than 3,000 young women through social media to create pornographic content through threats and manipulation. <u>Id.</u> ¶ 15. He continued to do

so from the Metropolitan Detention Center, even after multiple cell phones were confiscated from him. Id. ¶ 22.

Mr. Roman's conduct, as detailed in the PSR, is truly chilling. Roman told Mariah's co-defendant Gennie Harrison that he forced her to make pornographic videos with her four-month-old son because he was "horny" and he wants "[her] to submit to me." Id. ¶ 48.[2]

Nonetheless, Mariah fully accepts responsibility for her actions. She wishes she never spoke to "Ashley" or agree to take photos of herself for money. Id. ¶ 72. Moreover, she recognizes that although she felt threatened by Mr. Roman, she did not have to do what he was demanding and could have said no and perhaps if she was not desperate for money, she could have found a way to do so. She recognizes that what she did to her son was horribly wrong and she will carry that shame for the rest of her life. That is why Mariah chose to plead guilty to possessing child pornography on May 15, 2023. Id. ¶ 4. This felony sex offense will require that she register as a sex offender for foreseeable years of her life. PSR at 39.

### Mariah's Post-Arrest Conduct

After her arrest, Mariah was in a dangerous downward spiral. She struggled with pretrial conditions, especially her curfew because she did not have a real permanent residence. She was 18 years old and had never had anyone expecting her to be home at a certain hour.  Instead, she had to care for herself and be careful not to overstay her welcome with Darielly, her aunt, or other friends while keeping her Pretrial Officer abreast of where she planned to sleep at all times. ████████ She slept more than 14 hours a day, hiding from the new reality of her life. She lost her partner and her son in the blink of an eye, and her only purpose and joy—caring for her son— was gone. She stopped attending school and lost her opportunity to earn her high school equivalency—something she was just a semester away from achieving. Darielly believed that Mariah "was giving up on herself." Ex. E at 1.

The Federal Defenders of New York social workers spoke regularly with Mariah, helped her to meet with her psychologist and ACS case worker, and come to

---

[2] For more than two years, defense counsel hoped that the United States Attorney's Office would defer Mariah's prosecution. Reading a full accounting of Mr. Roman's conduct in the PSR, counsel even more steadfastly believes that a deferred prosecution was the most appropriate disposition.

a better understanding with her Pretrial Officer. Rachel Rapps, a former social work intern, worked with Mariah from October 2021 to February 2022. See Ex. H (Letter from Rachel Rapps). By then, Mariah was much improved. She had stopped smoking marijuana and has not had a positive test since February 2021. PSR ¶ 119. Rachel wrote Mariah "works every day to strive for a brighter future for herself and her family." Id. To that end, Mariah began engaging in weekly sessions with both Rachel and her court-provided therapist. Id. at 2; PSR ¶ 115. For two years, Mariah met regularly with a therapist at N.Y. Mental Health Group. Id. Working with a therapist that she trusted for a sustained period of time, she was able to be vulnerable and make real progress. Id.

Mariah's family and friends noticed her positive growth. Darielly writes, "She's been going through this for a long time now, and she's so young. She's proven to herself and to all of us that she can be a better person." Ex. D at 2. Darielly's mother Dionely said that when Mariah lived with them, she helped the family with cooking, cleaning, and laundry. Ex. F at 1. She was helpful, and they never had any issues. Id. Her aunt Yohanny explains that Mariah is a "good and optimistic person", "very attentive and caring, and always helps around the house." Ex. E.

Mariah's housing instability reached a boiling point in May 2022, and she moved briefly to Rhode Island to live with her then-boyfriend's family. As a result, her supervision was temporarily handled by the District of Rhode Island and her therapy was terminated. See PSR at 2; ¶ 110. Mariah was pregnant with her second child, and she and her boyfriend agreed it was important for her to have safe housing. Id. ¶ 106. While in Rhode Island, Mariah found work at UPS, a job she enjoyed despite the difficulties of completing physical labor while pregnant. Id. ¶ 128. Angel Medina, who lived with her in Rhode Island, writes in his letter of support that Mariah "cares about other people," follows all of ACS's rules, and just "wants to do something good for her kids." Ex. I (Letter from Angel Medina). Unfortunately, she was unable to stay with his family long-term, and Mariah returned to New York in July 2022. She asked to continue working with the same counselor from N.Y. Mental Health Group, but that request was not successful. Id. ¶ 117.

After Rachel finished her internship, Mariah began working with Brittany Larson, a licensed clinical social worker at our office. See Ex. J (Letter from Brittany Larson). They continue to work together today. In her letter, Brittany writes that "over the past three years Mariah has made herculean efforts to comply with supervision and transition toward adulthood." Id. at 1. Although Mariah struggled at times with her curfew and to keep appointments, Brittany explains that it is most likely because Mariah "retreats into isolation" when overwhelmed. Moreover,

Brittany details that between her ACS involvement, pretrial supervision, mental health counseling and legal team (in federal court and family court), Mariah had to keep track of 15 people, some of whom cycled in and out regularly. Id. Brittany writes:

> "For Mariah: developmentally still an adolescent, struggling with her trauma history, often experiencing food and housing insecurity, barred from her family after a misguided effort to protect them, the administrative tasks felt onerous and demoralizing. When she struggled to stay on top of things, she felt like a failure which exacerbated her depressive symptoms and further limited her ability to respond proactively."

Id. There is no question that her length supervision has been a slog, but to both Mariah and Pretrial Officer Courtney DeFeo's credit, they have continued to work together and reach understanding often without court or counsel involvement.

Mariah has had two children since the start of this case with her ex-boyfriend, Christian. PSR ¶ 106. Prior to her second child's birth, the Federal Defenders referred Mariah to the Bronx Defenders Family Court practice in anticipation of ACS involvement. While this case has pending in federal court, so too has an ACS case in family court as to Mariah's two younger children (her first son is living in Georgia and involved in his services there). In her family court case, Mariah is represented by Kaitlyn Hartmann, a supervising attorney in the Bronx Defenders' Family Defense Practice. See Ex. K (Letter from Kaitlyn Hartmann). Kaitlyn explains that from the "start of her family court case Ms. Jaquez has been open to the recommendations of the Court and her case workers from . . . ("ACS") about what services they wanted her to engage in." Id. at 2. These services have included individual counseling as well as sex offender treatment. Id. Moreover, Mariah agreed voluntarily to a finding by the family court of "abuse." Id. These actions demonstrated to ACS that Mariah had grown in maturity and was ready for more visitations with her children. Kaitlyn writes:

> "Ms. Jaquez always talks about her children and how much she loves them. She is always eager to take advantage of her supervised visitation with her children and celebrate their milestones. It is incredibly important to note that since ACS filed a case against Ms. Jaquez on April 26, 2022, no ACS worker or visit supervisor has raised a single concern about Ms. Jaquez's interactions with her children. Ms. Jaquez recently gave birth to a baby girl. On August 1, 2023, an ACS caseworker testified under oath that she observed Ms. Jaquez with her newborn in

the hospital and had no concerns about how Ms. Jaquez cared for her and neither did the Jacobi hospital staff who treated Ms. Jaquez and her newborn. I think this speaks volumes about who Ms. Jaquez is *now* as a person and a parent."

Id.

Because of her strides, Mariah is now permitted by the Family Court to "have liberal visitation with her newborn supervised by her family members who have been cleared by ACS." Id. She has also applied for long-term housing through Jericho Project and receives SNAP benefits and other public assistance. Id. at 3; PSR ¶ 129. Mariah hopes and prays for a chance to be reunited full-time with her children and to provide them with a stable home.

Finally, since October 2020, Mariah has had no new arrests. PSR ¶ 6. In fact, this case is the only time she has ever been arrested. Id. ¶¶ 89–91. She has also not tested positive for any drugs, including marijuana in more than two years. Id. ¶ 6. At the same time, she has suffered from severe housing instability. After several months searching for more stable housing and bouncing between the couches and floors of her family and friends, Mariah started sleeping in her boyfriend's car in April 2023. Id. ¶ 109. She was pregnant at the time with their third child. She could not live with him because their older son was in his apartment, and ACS has not yet allowed her to live with her two younger children. After two months in the car, Mariah agreed to move to a shelter in the Bronx. Id. ¶ 108. She stayed there for several months, but is now staying with her Darielly again, to be closer to her ex-boyfriend's apartment for her visits with her children.

## **The Only Appropriate Outcome: Time Served.**

Mariah is scheduled to be sentenced on Tuesday, September 19, 2023. The advisory Guideline Range is the statutory max, 240 months. Id. at 36. The Guidelines are merely advisory, and this Court "may not presume that the Guidelines range is reasonable," but rather "must make an individualized assessment based on the facts presented." Gall v. United States, 552 U.S. 38, 50 (2007). Because the Government stated in its plea agreement with Mariah that unless new facts come to light (which none have), it intends to recommend a sentence "substantially below" the advisory Guidelines, the defense will not belabor its criticism of the Guidelines. See PSR at 5. These particular Guidelines have been nearly-universally lambasted as irrationally harsh and not tied to empirical data, the loadstar of the Guidelines. See generally

<u>United States v. Jenkins</u>, 854 F.3d 181 (2d Cir. 2017); <u>United States v. Dorvee</u>, 616 F.3d 174, 184 (2d Cir. 2010). The Guidelines recommended sentence in this case—an unfathomable 20 years—demonstrates the critics' point with emphasis.

       Section 3553(a) of Title 18 of the United States Code mandates that the Court impose a sentence "sufficient, but not greater than necessary" to achieve the goals of retribution, deterrence and rehabilitation. The Second Circuit has explained that, "[i]n deciding what sentence will be 'sufficient, but not greater than necessary' . . . a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." <u>United States v. Singh</u>, 877 F.3d 107, 121 (2d Cir. 2017) (internal quotation marks omitted). Considering each of the goals of sentencing with a "generosity of spirit," a sentence of time served is the most just and appropriate total sentence for this case.

     I.      Mariah's History & Characteristics and Need for Continued Mental Health Treatment Call for a Sentence of Time Served.

       As detailed above, Mariah's childhood was a nightmare. She was abused, abandoned, and neglected. She has suffered serious trauma ████████████ ██████████████████████████ In every meaningful way, Mariah's upbringing leading up to the offense conduct is substantially mitigating. Additionally, Mariah benefited from sustained ongoing mental health treatment in the community, which she should be able to continue while on supervised release but not in prison. Given her history and characteristics, described in detail above, and need for continued mental health treatment, a sentence of time served is appropriate.

     II.      Mariah's Crime Does Not Require a Term of Incarceration.

       Actual sexual contact with a minor, filming it, and sending it to another person is no question serious crime. It often results in a mandatory and lengthy term of imprisonment. <u>See</u> 18 U.S.C. § 2251. However, Mariah's actions are not comparable to these case because of Mr. Roman's actions and influence. Dr. Calkins believes that "Mariah is as much victim as she is a perpetrator" Ex. A at 2. She notes that Mariah does not have a deviant sexual interest in children and presents little risk for reoffending. <u>Id.</u> at 2, 12. She has no known prior offenses, interest in child pornography, antisocial orientation, or sexual interest in children. <u>Id.</u> at 12. Instead, Dr. Calkins believes that Mariah is "a vulnerable young woman who has impaired judgement, poor impulse control, and few problem-solving abilities or other life skills." <u>Id.</u> at 11. To that end, Dr. Calkins believes that she needs support more than anything else. <u>Id.</u> at 12.

Despite Mr. Roman's role in this offense, Mariah takes fully responsibility for her actions. Her sister writes that when Mariah was living in the shelter, she would call her sister in the middle of the night crying, wishing she could change what she did. Ex. C at 1. Brittany sums up her remorse and acceptance best:

> "Mariah is very remorseful. Lacking secure attachment to her own caregivers, she dreams of showing her children the love, care, and stability that she and her siblings lacked. If not for the direct threat to her and her family's wellbeing, it is unimaginable that Mariah would ever cause harm to her children. She has been punished by the enduring shame of placing her child in danger while trying to protect herself and her child."

Ex. J at 2.

Finally, it is important to remember that Mariah was only 18 years old when this crime happened. While humans' capacity to reason and deliberate systematically matures by around age 16, our ability to exercise self-regulation, especially in socially and emotionally arousing contexts, does not mature for roughly another five years. See Laurence Steinberg & Grace Icenogle, Using Developmental Science to Distinguish Adolescents and Adults Under the Law, 1 ANN. REV. OF DEVELOPMENTAL PSYCH. 21, 34 (2019). Mariah, in other words, was at a developmental disadvantage compared to older adults. Id. This limitation paired with her mental illnesses and cognitive challenges described above demonstrates that Mariah should not be considered as culpable as an older offender. This same reasoning was adopted by the Supreme Court in Roper v. Simmons, which banned the use of the death penalty for crimes committed by people younger than 18 and in the Court's later juveniles-are-different line of cases. See Roger v. Simmons, 543 U.S. 551, 578 (2005); Graham v. Florida, 560 U.S. 48, 68 (2010) ("developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds"); Miller v. Alabama, 567 U.S. 460, 472 n.5 (2012) ("The evidence presented to us in these cases indicates that the science and social science supporting Roper's and Graham's conclusions have become even stronger."); Montgomery v. Louisiana, 577 U.S. 190, 212 (2016).

Given Mariah's full acceptance of responsibility, her age, her low risk of recidivism, and Mr. Roman's role in the offense, a term of incarceration is not necessary despite Mariah's very serious conduct.

III.  A Sentence of Time Served Would Not Create Unwarranted Sentencing Disparities.

A non-incarceratory sentence for a person who pled guilty to possessing child pornography is in line with Southern District norms. Since <u>Dorvee</u> was decided in 2010, Southern District judges in Manhattan have sentenced 36 defendants to either time served or probation. <u>See</u> Ex. L. The same result is warranted here.

IV.  The Collateral Consequences of Mariah's Conviction Are Severe and Sufficient Punishment.

Mariah will suffer several collateral consequences from her conviction that amount to sufficient punishment for her actions. First, she will be on supervised release for at least five years, as required by statute. PSR at 36. That means that Mariah will be supervised for at least a total of eight years for this case, including her time on pretrial supervision.

Second, Mariah will have to register as a sex offender. New York State's Court System states: "Sex offender registration can lead to social disgrace and humiliation, loss of relationships, jobs, and housing, and both verbal and physical assaults. There may be restrictions on where you can live and what job you can hold."[3] If Mariah is required to register as a Level 2 offender, she may be barred from federally subsidized housing, her name will be featured on New York's sex offender website, they will be required to report in person every three years for life, they will be re required to complete an annual verification form, their community may be notified of their presence, and their picture will be taken every three years. Failing to keep up with these responsibilities could result in New York State felony charges. <u>See generally</u> <u>id.</u>

Mariah will not be able to get certain jobs, and employers may not hire her due to her status as a sex offender. She may struggle to go back to school or pursue a college degree, and she will be barred from severing in the military, which had previously been a goal of hers.  She will also be burdened by the additional collateral consequences that come with being a felon: loss of the right to vote, sit on a jury, hold certain jobs, and bear arms.

---

[3] Available at https://www.nycourts.gov/courthelp/criminal/sexOffenderConsequences.shtml (last visited Sept. 6, 2023).

Third, Mariah will continue to have ACS involvement in her life and her children's lives. She will have to meet benchmarks and continue to have supervised visits with her children in the hopes of one day getting at least shared custody of them. Moreover, as Kaitlyn explains in her letter, because of her ACS case, Mariah is on the New York State Central Register for Child Abuse and Maltreatment. See Ex. K. Under the Social Services Law, the State Central Register must disclose to certain types of employers whether a person is named on the register and Mariah's name will be disclosed to any employer required to conduct this check. This means that while Mariah is in the community, there are already legal guards in place requiring relevant employers to be made aware of Ms. Jaquez's ACS history before offering her employment. Id.

V.    The Defense Objects to some of the Proposed Special Conditions of Supervised Release.

The defense objects to the following proposed special conditions by Probation:

1. Outpatient drug treatment. Mariah has been drug-free for years. Instead, the Court should order an initial drug screening, and if negative, suspend further drug testing.

2. Outpatient sex offender treatment. As detailed above, Mariah is not a sexual predator or attracted to children. Given that she has agreed to sex offender treatment through ACS, that should be sufficient to satisfy any potential benefit this treatment may provide while mitigating the potential harms.

3. Installation of tracking software. Given the offense in this case, such software is an unreasonable invasion of Mariah's privacy and is not needed to assure the safety of the community.

4. Contact with children unless approved by Probation. Such a condition would be incredibly burdensome and punitive. Instead, Mariah should be required to follow ACS directives and allow ACS to determine which minors she may have contact with and when.

5. Contact with the victim. Whether Mariah can have contact with her eldest son should be determined by ACS and its equivalent agency in Georgia, not Probation.

**United States v. Jaquez, 21 Cr 190-3**                                Page 18 of 18
**Sentencing Submission (September 6, 2023)**

6. Financial Information. Because this case did not involve any financial fraud or misappropriation of funds, the defense objects to Mariah providing Probation with access to her financial information.

### Conclusion

The wake of Mr. Roman's actions is far-reaching. His manipulation and coercion ruined lives, including Mariah's. She has suffered considerably for her actions on October 2, 2020, and now she is to be sentenced. Everything Mariah does now is for her children, and she is motivated to stay on the "right path." Ex. C at 2. Prison is not a necessary stop on her journey. She has suffered enough. The defense respectfully requests a sentence of time served.

Respectfully Submitted,

/s/

Ian H. Marcus Amelkin
Federal Defenders of New York, Inc.
(212) 417-8733
ian_marcus_amelkin@fd.org

CC:    AUSA Rebecca Dell, Esq.

# EXHIBIT A

# EXHIBIT B

## CURRICULUM VITAE

# Cynthia Calkins Mercado

John Jay College of Criminal Justice
The City University of New York
445 West 59th Street New York, NY 10019-1199
Phone: (212) 484-1111   Fax: (212) 237-8930
Email: cmercado@jjay.cuny.edu

## CURRENT POSITION

**Associate Professor** (2010-present)
Assistant Professor (2005-2009)
Department of Psychology
John Jay College of Criminal Justice, New York, NY

## EDUCATION

2003            **Doctor of Philosophy**
               **University of Nebraska-Lincoln, Psychology Department**
               *Area of Study:*  Clinical Psychology/Psychology-Law
               *Dissertation:* Decision-making about volitional impairment in the sexual predator
               commitment context

2002            **Masters of Legal Studies**
               **University of Nebraska-Lincoln, Law College**

1997            **Masters of Arts**
               **University of Nevada, Las Vegas, Psychology Department**
               *Area of Study:*  Clinical Psychology
               *Thesis:*  The effectiveness of Court Appointed Special Advocates (CASAs) to assist
               in permanency planning
               1997 '*Outstanding Thesis in Psychology'* Award

1995            **Bachelor of Arts**
               **State University of New York at Buffalo**
               Major:  Psychology

## ACADEMIC POSITIONS

2004-2005       **Lecturer**, Monash University
               Department of Psychological Medicine, Melbourne Australia

## AREA OF RESEARCH SPECIALIZATION

Establishing empirical evidence for use in sex offender policy and sexual violence prevention.

**PEER REVIEWED RESEARCH PUBLICATIONS (\* denotes student author)**

Jeglic, E.L, **Mercado, C.C.,** & Levenson, J. (in press). The prevalence and correlates of depression and hopelessness among sex offenders subject to community notification and residence restriction legislation. *American Journal of Criminal Justice.*

\*Blasko, B., Jeglic, E.L., & **Mercado, C.C.** (2010). Are actuarial risk data used to make determinations of sex offender risk classification? An examination of sex offenders selected for enhanced registration and notification. *International Journal of Offender Therapy and Comparative Criminology, XX,* xx-xx.

\*Colombino, N., **Mercado, C.C.**, & Jeglic, E.L. (2009). Situational aspects of sexual offending: Implications for residence restriction laws. *Justice Research and Policy, 11,* 27-43.

\*Chajewski, M., & **Mercado, C.C.** (2009). An impact evaluation of sex offender residency restrictions in rural, urban and county-wide jurisdictions. *Criminal Justice Policy Review, 20,* 44-61.

Terry, K.J., **Mercado, C.C.,** & \*Perillo, A. (2008). Priests who abuse and were abused: Understanding victimization in the Catholic Church. *Victims and Offenders, 3,* 412-422.

\*Robilotta, S., **Mercado, C.C.,** & DeGue, S. (2008). Application of the polygraph examination in the assessment and treatment of Internet sex offenders. *Journal of Forensic Psychology Practice, 8,* 383-393.

**Mercado, C.C.**, \*Alvarez, S., & Levenson, J. (2008). The impact of specialized sex offender legislation on community re-entry. *Sexual Abuse: A Journal of Research and Treatment, 20,* 188-205.

**Mercado, C.C.**, \*Tallon, J.A, & Terry, K.J. (2008). Persistent sexual abusers in the Catholic Church: An examination of characteristics and offenses patterns. *Criminal Justice and Behavior, 35,* 629-642.

\*Perillo, A.D., **Mercado, C.C.,** & Terry, K.J. (2008). Repeat offending, victim gender, and extent of victim relationship in Catholic Church sexual abusers: Implications for risk assessment. *Criminal Justice and Behavior, 35,* 600-614.

**Mercado, C.C.**, & Ogloff, J.R.P. (2007). Risk and the preventive detention of sex offenders in Australia and the United States. *International Journal of Law and Psychiatry, 30,* 49-59.

**Mercado, C. C**, Bornstein, B.H., & Schopp, R.F. (2006). Decision-making about volitional impairment in Sexually Violent Predators. *Law and Human Behavior, 30,* 587-602.

Boothroyd, R.A., **Mercado, C.C.**, Poythress, N.G., Christy, A., & Petrila, J. (2005). Clinical outcomes of defendants in mental health court. *Psychiatric Services, 56,* 829-834.

**Mercado, C.C.,** Schopp, R.F., Bornstein, B.H. (2005). How might mental health professionals understand sex offender volitional impairment? Conceptualizing "inability to control" following the *Hendricks* and *Crane* decisions. *Aggression and Violent Behavior: A Review Journal, 10,* 289-309.

Elbogen, E.B., **Mercado, C.C.**, Tomkins, A.J., & Scalora, M.J.   (2002).  Perceived relevance of factors for violence risk assessment:  A survey of clinicians.  *International Journal of Forensic Mental Health, 1,* 37-48.

**Mercado, C.C.,** Elbogen, E.B., Scalora, M.J., & Tomkins, A.J.  (2001).  Judgments of dangerousness:  Are sex offenders assessed differently than civil psychiatric patients?  *Psychiatry, Psychology, and Law, 8,* 146-153.

**Mercado, C.C.**, & Scalora, M.J.  (2001).   Child molestation:  Factors related to level of violence.  *Journal of Threat Assessment, 1,* 21-34.

**Calkins, C.A.,** & Millar, M.  (1999).  The effectiveness of Court Appointed Special Advocates to assist in permanency planning.  *Child and Adolescent Social Work Journal, 1(2)*, 37-45.


## ENCYCLOPEDIA ENTRIES

**Mercado, C.C.**  (2008).  Sex offender treatment.  In B. Cutler (Ed.), *Encyclopedia of Psychology and Law.*  Sage Publications.


## BOOK CHAPTERS, MONGRAPHS, NEWSLETTERS, & RE-PRINTS

**Mercado, C.C.,** Terry, K., & *Perillo, A.  (in press).  Sexual abuse in the Catholic Church and other youth serving organizations.  *International Perspectives on Sexual Offending.* Wiley (D. Boer, Ed.)

**Mercado, C.C.**, Merdian, H.L., & Egg, R.  (in press).  The Internet and sexual offending:  An international perspective.  *International Perspectives on Sexual Offending.*  Wiley (D. Boer, Ed.)

*Perillo, A., & **Mercado, C.C.**  (2010). Assessment and treatment of sexual offenders.  In P. Chauhan (Ed.), *Mental Health Issues in Forensic Psychology.*  New York:  Mc-Graw-Hill

**Mercado, C.C.**  (2009, Summer).  Are residence restrictions an effective way to reduce the risk posed by sex offenders?  *American Psychology-Law Society (APLS) Newsletter.*

Jeglic, E., *Maile, C., & **Mercado, C.C.**  (2010).  Treatment of offender populations:  Implications for risk management sand community reintegration. *Rethinking Corrections.* Sage. (L. Gideon & H. Sung, Eds).

*Colombino, N., & **Mercado, C.C.**  (2009).  Do sex offenders meet victims in places where children congregate?  An analysis of sex offender perpetration patterns.  *Sex Offender Law Report.*

**Mercado, C.C.**, & Bornstein, B.H.  (2008).  Does proximity to schools tempt former sex offenders?  *APA Monitor on Psychology.*

*Chajewski, M., & **Mercado, C.C**. (2008). An analysis of sex offender residency restrictions in Newark, New Jersey. *Sex Offender Law Report, 9,* 1, 11-15 .

**Mercado, C.C.** (2006). Detención preventiva de los abusadores sexuales: Una perspectiva comparativa de ley. *Pensamiento Psicológico, 7,* 7-14. (Reprinted from *Sex Offender Law Report, 7(4),* pp. 51-54, by C.C. Mercado, 2006).

**Mercado, C.C.,** & Bornstein, B.H. (2006). Expert testimony in insanity cases. *APA Monitor on Psychology, 37(10),* 59-61.

**Mercado, C.C.** (2006). Comparative law perspective of the preventive detention of sex offenders. *Sex Offender Law Report, 7(4),* 51-54.

Elbogen, E.B., **Mercado, C.C.**, Tomkins, A.J., & Scalora, M.J. (2001). Clinical practice and violence risk assessment. In D. Farrington, C.R. Hollin, & M. McMurran (Eds.), *Sex and Violence: The psychology of crimes and risk assessment.* Reading, England: Harwood Academic

## BOOK REVIEWS

**Mercado, C.C.** (2009). Review of M.L. Hidalgo (2007) *Sexual Abuse and the Culture of Catholicism: How Priests and Nuns become Perpetrators.* New York: The Haworth Maltreatment and Trauma Press. In *Journal of Trauma and Dissociation, 10,* 224-226.

## ARTICLES UNDER REVIEW

*Kleban, H., Jeglic, E.L., & **Mercado, C.C.** (in revision). An exploration of crossover sexual offending: Prevalence and risk factors. *Sexual Abuse: A Journal of Research and Treatment*

*Colombino, N., **Mercado, C.C.**, Levenson, J., & Jeglic, E.L. (under review). Can "child safety zones" prevent sex offense recidivism? An examination of where sex crimes occur.

## EDITORIAL/REVIEWING SERVICE

### Ad Hoc Manuscript Reviewer

*Law and Human Behavior*
*Psychology, Public Policy, and Law*
*Psychology, Crime, & Law*
*Journal of Offender Rehabilitation*
*International Journal of Offender Therapy and Comparative Criminology*
*Journal of Forensic Psychology Practice*
*Journal of Research in Crime & Delinquency*
*International Journal of Comparative and Applied Criminal Justice*

**Associate Editor**

*Glossary of the Social and Behavioral Sciences, Sage Publishers*

GRANTS AWARDED

| | |
|---|---|
| 2009 | **National Institute of Justice (NIJ) 2009-IJ-CX-0036, $283,651**<br>Title:  Identifying Situational and Individual Risk Factors for Child Sexual Abuse in Institutional Settings:  Implications for Public Safety and Primary Prevention<br>PI:  Cynthia Calkins Mercado |
| 2008 | **CUNY Collaborative, $39,963**<br>Title:  Sex Offender Management, Treatment, and Civil Commitment:  An Empirical Analysis of Four Sex Offender Populations<br>PIs:  Cynthia Calkins Mercado, Elizabeth Jeglic, & Steve Zeidman |
| 2008 | **John Jay College Scholarly Excellence** Award (equivalent of two course releases) |
| 2008 | **John Jay College Research Assistance Program, $1000** |
| 2007 | **National Institute of Justice (NIJ) GMS 2007-IJ-CX-0037, $296,656**<br>Title:  Sex Offender Management, Treatment, and Civil Commitment:  An Evidence Based Analysis Aimed at Reducing Sexual Violence<br>PIs:  Cynthia Calkins Mercado & Elizabeth Jeglic |
| 2007 | **John Jay College Forensic Psychology Research Institute (FPRI), $5000**<br>PIs:  Cynthia Calkins Mercado & Elizabeth Jeglic |
| 2007 | **John Jay College Research Assistance Program, $1000** |
| 2007 | **PSC-CUNY Research Grant, $4500** |
| 2006 | **John Jay College Forensic Psychology Research Institute (FPRI), $2460** |
| 2006 | **PSC-CUNY Research Grant, $4700** |
| 1999-2003 | **University of Nebraska-Lincoln Warden Research and Travel Award, $3000** |
| 2001 | **American Psychology-Law Society (AP-LS)/Division 41 Grants-In-Aid, $500** |

**INVITED TALKS**

July 2006          **Avances en Psiocologia Forense**
                   Pontificia Universidad Javeriana, Cali, Colombia

**RESEARCH PRESENTATIONS (Last five years only)**

**Mercado, C.C.,** & Jeglic, E. (2010, March). Sexually violent predator commitment: An examination of how actuarial risk scores and other offense factors influence commitment decisions. Paper presented at the annual meeting of the American Psychology-Law Society (AP-LS), Vancouver, BC.

*Perillo, A.D., **Mercado, C.C.,** & Spada, A.H. (2010, March). Prevalence of risk assessment-relevant factors among sexually abusive clergy: A comparison with convicted sex offenders. . Paper presented at the annual meeting of the American Psychology-Law Society (AP-LS), Vancouver, BC.

**Mercado, C.C.,** Jeglic, E., & *Quesada, S. (2009, November). An examination of factors that predict SVP commitment in a statewide sample of sex offenders. Paper presented at the annual meeting of the American Society of Criminology (ASC), Philadelphia, PA.

*Colombino, N., **Mercado, C.C.** & Jeglic, E. (2009, November). The importance of sex offender type: A comparison of rapists and child molesters. Paper presented at the annual meeting of the American Society of Criminology (ASC), Philadelphia, PA.

Jeglic, E., **Mercado, C.C.,** & *Ackerman, A.R. (2009, November). A comparison of characteristics of sex offenders in a treatment facility and in the general population. Paper presented at the annual meeting of the American Society of Criminology (ASC), Philadelphia, PA.

*Robilotta, S., Jeglic, E., & **Mercado, C.C.** (2009, November). Sex offenders' emotional reactions to civil commitment: A qualitative analysis. Paper presented at the annual meeting of the American Society of Criminology (ASC), Philadelphia, PA.

*Litivnoff, L.., *Perillo, A., & **Mercado, C.C.** (2009, November). Cross-group comparisons: Sexual abuse, professional misconduct, and boundary violations in the Catholic Church. Poster presented at the annual meeting of the American Society of Criminology (ASC), Philadelphia, PA.

Jeglic, E.L., **Mercado, C.C.,** & *Ackerman-Acklin, A. (2009, October). Selection for sex offender treatment: A large-scale comparison of offenders selected and not-selected for treatment. In **C.C. Mercado** (Chair), *Sex offender treatment and civil commitment: An investigation of the processing of offenders in a statewide system.* Symposium presented at the annual meeting of the Association for the Treatment of Sexual Abusers ATSA), Dallas, TX.

**Mercado, C.C.**, Jeglic, E., & *Quesada, S. (2009, October). An examination of factors that predict SVP commitment across groups of treated and non-treated sex offenders. In **C.C. Mercado** (Chair),

*Sex offender treatment and civil commitment: An investigation of the processing of offenders in a statewide system.* Symposium presented at the annual meeting of the Association for the Treatment of Sexual Abusers ATSA), Dallas, TX.

*Colombino, N., **Mercado, C.C.**, & Jeglic, E.L. (2009, October). The importance of sex offender type: A comparison of rapists and child molesters. In **C.C. Mercado** (Chair), *Sex offender treatment and civil commitment: An investigation of the processing of offenders in a statewide system.* Symposium presented at the annual meeting of the Association for the Treatment of Sexual Abusers ATSA), Dallas, TX.

*Colombino, N., **Mercado, C.C.**, & Jeglic, E. (2009, March). Situational aspects of sexual offending. Implications for residency restrictions and GPS monitoring laws. Paper presented at the annual meeting of the American Psychology Law-Society (APLS), San Antonio, TX.

**Mercado, C.C.,** & *Chajewski, M. (2009, March) An impact evaluation of sex offender residency restrictions. Paper presented at the annual meeting of the American Psychology-Law Society (APLS), San Antonio, TX.

*Quesada, S.P., **Mercado, C.C.**, & Jeglic, E.L. (2009, March). The reliability of the Static-99: A comparison of researcher and clinician ratings. Poster presented at the annual meeting of the American Psychology-Law Society (APLS), San Antonio, TX.

*Robilotta, S.A., *Ackerman, A., & **Mercado, C.C.** (2009, March). Early victimization and the relationship to adult sexual offense patterns. Poster presented at the annual meeting of the American Psychology-Law Society (APLS), San Antonio, TX.

*Robilotta, S.A., & **Mercado, C.C.** (2009, March). Pornography exposure and sexual offending: A comparative analysis of sex offenders. Paper presented at the annual meeting of the American Psychology Law-Society (APLS), San Antonio, TX.

**Mercado, C.C.**, Jeglic, E.L., & *Robilotta, S.A. (2009, March). Initial findings from an investigation of sex offender risk, selection for treatment, and SVP commitment. Paper presented at the annual meeting of the American Psychology-Law Society (APLS), San Antonio, TX.

*Perillo, A., & **Mercado, C.C.,** & Terry, K. (2008, October). Patterns of age and sexual recidivism among clergy sexual abusers. Paper presented at the annual meeting of the Association for the Treatment of Sexual Abusers (ATSA), Atlanta, GA.

**Mercado, C.C.**, Jeglic, E., & *Ackerman, A. (2008, October). An examination of factors that predict Sexually Violent Predator (SVP) commitment in a sample of treated sex offenders. Paper presented at the annual meeting of the Association for the Treatment of Sexual Abusers (ATSA), Atlanta, GA.

Jeglic, E., *Katz, S., & **Mercado, C.C.** (2008, October). Sex offender reactions to civil commitment. Poster presented at the annual meeting of the Association for the Treatment of Sexual Abusers (ATSA), Atlanta, GA.

*Robilotta, S., **Mercado, C.C.,** & *Ackerman, A. (2008, October). Early abuse history and its relationship to sexual offending. Poster presented at the annual meeting of the Association for the Treatment of Sexual Abusers (ATSA), Atlanta, GA.

*Colombino, N., **Mercado, C.C.,** & Jeglic, E. (2008, October). Situational aspects of sexual offending. Poster presented at the annual meeting of the Association for the Treatment of Sexual Abusers (ATSA), Atlanta, GA.

*Alvarez, S., & **Mercado, C.C.** (2008, March). What do sex offenders think about notification and residency restriction statutes: An examination of offender narratives. Poster presented at the annual meeting of the American Psychology-Law Society (APLS), Jacksonville, FL.

**Mercado, C.C.**, *Tallon, J.A., & Terry, K.J. (2008, March). Serial clergy abusers: An examination of the characteristics and patterns of priests with multiple allegations of sexual abuse. In **C.C. Mercado** (Chair), *Sexual abuse in the Catholic Church: Offending patterns and risk implications.* Symposium presented at the annual meeting of the American Psychology-Law Society (APLS), Jacksonville, FL.

*Perillo, A.D., & **Mercado, C.C.** (2008, March). Specific Risk Assessment in Catholic Church Sexual Abuse: A Comparison to General Sex Offender Research. In **C.C. Mercado** (Chair), *Sexual abuse in the Catholic Church: Offending patterns and risk implications.* Symposium presented at the annual meeting of the American Psychology-Law Society (APLS), Jacksonville, FL.

*Perillo, A.D., & **Mercado, C.C.** (2008, March). Patterns of Age and Recidivism among Clergy Sexual Abusers. In **C.C. Mercado** (Chair), *Sexual abuse in the Catholic Church: Offending patterns and risk implications.* Symposium presented at the annual meeting of the American Psychology-Law Society (APLS), Jacksonville, FL.

**Mercado, C.C.,** & *Chajewski, M. (2007, October). *Sex offender residency restrictions: A geospatial analysis.* Paper presented at the 26th Annual Association for the Treatment of Sexual Abusers (ATSA) conference, San Diego, CA.

Jeglic, E.L., & **Mercado, C.C.** (2007, October). *The stability of sex ofender typologies.* Poster presented at the 26th Annual Association for the Treatment of Sexual Abusers (ATSA) conference , San Diego, CA.

*Perillo, A.D., **Mercado, C.C.,** & Terry, K.J. (2007, October). *Recidivism, victim gender, and extent of victim relationship in Catholic Church sex offenders.* Poster presented at the 26th Annual Association for the Treatment of Sexual Abusers (ATSA) conference, San Diego, CA.

*Robilotta, S., & **Mercado, C.C.** (2007, October). *The role of pornographic exposure in the etiology of sex offending: A comparison of sex offenders and non-sex offenders.* Poster presented at the 26th Annual Association for the Treatment of Sexual Abusers (ATSA) conference, San Diego, CA.

**Mercado, C.C.**, & Jeglic, E.  (2007, July).  *Early victimization and the relationship to later offending patterns in sex offenders.*  Paper presented at the Third International Congress of Psychology and Law, Adelaide, Australia.

**Mercado, C.C.**, *Alvarez, S., & *Sahlstrom, K.  (2007, June).  *Depression and hopelessness among sex offenders: Implications for risk management.*  Paper presented at the North American Correctional and Criminal Justice Psychology Conference, Ottawa, Ontario.

*Chajewski, M., & **Mercado, C.C.** (2007, March). *Geo-spatial analysis of sex offenders in the state of New Jersey.* Paper presented at the 9th National Institute of Justice (NIJ) Crime Mapping Conference, Washington, DC.

*Chajewski, M., & **Mercado, C.C.**  (2007, March).  *Sex offender residency restrictions:  A geo-spatial analysis.*  Paper presented at the Off the Witness Stand:  Using Psychology in the Practice of Justice conference, New York, NY.

**Mercado, C.C.**, & *Alvarez, S.  (2007, March).  *The impact of residency restrictions and community notification laws on sex offender reintegration.*  Paper presented at the Off the Witness Stand:  Using Psychology in the Practice of Justice conference, New York, NY.

**Mercado, C.C.,** Terry, K., Smith, M., & *Tallon, J.  (2006, September).  *Nature and scope of child sexual abuse by Catholic priests:  Victim characteristics.*  Paper presented at the annual conference of the Association for the Treatment of Sexual Abusers (ATSA), Chicago, IL.

Terry, K., **Mercado, C.C.**, *Tallon, J., & Smith, M.  (2006, September).  *Nature and scope of child sexual abuse by Catholic priests:  Offender characteristics.*  Paper presented at the annual conference of the Association for the Treatment of Sexual Abusers (ATSA), Chicago, IL.

**Mercado, C.C., ***Barber-Rioja, V., Kucharski, T., & Duncan, S.  (2006, March).  *Predicting institutional violence:  A comparison of the PCL-R, MMPI-2, and PAI.*  Paper presented at the annual meeting of the American Psychology-Law Society (APLS), St. Petersburg, FL.

**Mercado, C.C.**  (2005, March).  *An investigation into the ability to control deviant or offensive urges.*  Paper presented at the annual meeting of the American Psychology-Law Society (APLS), La Jolla, CA.

## RESEARCH ASSOCIATE
*Child sexual abuse in the Catholic Church:  Understanding the causes and context of the problem.*  (PI:  Dr. Karen Terry)

## MEMBER EXPERT ADVISORY PANEL
National Institute of Justice (NIJ), Sex offender management and sex offender residence restrictions panel

**PROFESSIONAL MEMBERSHIPS**

American Psychology-Law Society (AP-LS), Division 41
Association for the Treatment of Sexual Abusers (ATSA)
International Association for the Treatment of Sexual Abusers (IATSO)

## POSTDOCTORAL CLINICAL WORK

2005 – present      **Trainer, "Managing Situations Involving Mentally Disturbed Persons"**
New York City Police Department Training Program
Funded by a grant to the CUNY Research Foundation

Provide training for NYPD Recruits, Sergeants, and Emergency Services Unit officers and other law enforcement agencies on mental illness and interacting with emotionally-disturbed persons.

2004-2005      **Psychologist, Psychosexual Treatment Program**
Victorian Institute of Forensic Mental Health Service (*Forensicare*), Melbourne, Australia
Facilitated individualized treatment for a community-based sex offender population and performed court-ordered pre-sentence evaluations

## CLINICAL TRAINING

2002-2003      **APA-Accredited Clinical Psychology Internship Program**
***Louis de la Parte* Florida Mental Health Institute (FMHI)**
University of South Florida, Tampa, FL
Internship Director: Richard Weinberg, Ph.D.
Rotations: 1) Mobile Crisis Response Team, 2) DACCO Substance Abusing Mothers with Infants (SAMI) program, 3) Village of Excellence Charter School, 4) Hillsborough County Public Schools, and 5) Mental Health Policy Research

1999-2002      **Psychology Extern, Psychological Consultation Center,** University of Nebraska-Lincoln

2001-2002      Jointly performed forensic evaluations on a consultant basis with **Steven Blum, Ph.D.,** Lincoln, NE

1999-2000      Jointly performed forensic evaluations on a consultant basis with **Scott Bresler, Ph.D.,** Lincoln, NE

2000-2002      **Psychology Extern, Bryan LGH Medical Center West Assessment Team**
Child and Adolescent Psychiatric Services, Lincoln, NE

2000-2001      **Psychology Extern, Statewide Forensic Mental Health Service, Sex Offender Services,** Lincoln, NE

1999-2000      **Psychology Extern, Statewide Forensic Mental Health Service, Intensive Care and Observation Program,** Lincoln, NE

1996-1997      **Psychology Extern, Warner Wilson, Ph.D., Private Practice,** Las Vegas, NV

1996                    **Psychology Extern, Clark County Juvenile Courts Psychology Department,** Las Vegas, NV

1996-1997              **Court Appointed Special Advocate (CASA), CASA Program, Eighth Judicial District Court,** Las Vegas, NV

1995                    **Psychology Extern, State of Nevada Specialized Adolescent Sex Offender Treatment Program,** Las Vegas, NV

## TEACHING EXPERIENCE

### Ph.D. Level Courses
Survey of Psychology and Criminal Justice, John Jay College (co-teaching with Dr. Jen Dysart)
Intellectual Assessment, John Jay College
Civil Forensic Psychology, Monash University (co-taught with Dr. James Ogloff)
Criminal Forensic Psychology, Monash University (co-taught with Dr. James Ogloff)

### M.A. Level Courses
Evaluation of Sex Offenders, John Jay College
Sex Crimes, John Jay College
Psychology and Law, John Jay College
Objective Personality Assessment, John Jay College

### B.A. Level Courses
Psychology and the Law, John Jay College; Monash University
Abnormal Psychology, University of Nebraska-Lincoln
Clinical Psychology, University of Nebraska-Lincoln
Human Sexuality, University of Nebraska-Lincoln

## SPECIALIZED INTERNSHIP EXPERIENCE

June 1997 -            **Honor's Intern**
August 1997            **Federal Bureau of Investigation (FBI)**
                       Child Abduction and Serial Killer Unit**,** Quantico, VA

## REFERENCES
Available upon request.

# EXHIBIT C

Honorable J. Paul Oetken
United States District Court Judge
Southern District of New York
40 Foley Square, Courtroom 706
New York, NY 10007

Dear Judge Oetken,

I'm Mariah's younger sister, Angielisa Jaquez. I live in the Bronx with Mariah and our father. I'm 18 years old and I work at Chuck E. Cheese.  Mariah and I grew up in and out of foster homes and staying with different relatives. I was too young to remember all of it, but I would say they were terrible years. All I had was me and Mariah, just us two. Mariah was my sister, but also had to be like my mom. She looked out for me while she also taking care of herself.

Our mom passed away on my 13th birthday. It was very hard. For Mariah, it was shocking. She wasn't staying at home at the time, she was away. When we told her our mom was really sick, she thought we were lying to get her to come back home. All she's ever known is people feeding her lies, so it makes sense she didn't believe us. But then, she died. It hit Mariah very hard. She always thought it was her fault, because when my mom really needed us the most, we pushed her away. Before she passed, the person she most wanted to talk to was Mariah.

Around the time of what happened, me and Mariah were living together with our aunt, Yohanny. Everything was fine with Mariah, but it was hard for her because she was the only one taking care of the baby all the time. I would help her sometimes, or our aunt would, but Mariah didn't trust anyone else with the baby completely, and I was only 14. She felt like no one was there for her at the time. Our aunt was financially supporting us, Mariah wasn't working. Money always stressed us out. There were certain things we would want, but our aunt was the only one putting food on the table, and there were lots of other kids in the house. We knew not to ask for things we couldn't have. Mariah especially doesn't like to ask for much, she'd rather get it on her own.

I remember one morning, I was using the bathroom, and Mariah was in the living room. Mariah was blowing up my phone, texting me to come to the living room. I heard her in the other room crying hysterically. When I got out the bathroom, that's when she told me what was going on. She told me this guy was texting her that she had to do something with her baby or else something worse was gonna happen to her. She didn't have no other choice. She was really worried the guy was gonna do something to her. When she told me, I think it had just happened the night before. I was telling her to relax, that it wasn't her fault. She didn't know what to do. We talked about it, and I calmed her down. That's when she ended up calling the police and told them what's going on to ask for help. She was so worried, panicking, crying. I had never seen her cry like that. I couldn't believe what was happening.

To this day, Mariah talks about how she really regrets what she did. She wishes she could go back and do it all over. She knows that it was wrong. Sometimes, I still catch her crying out of nowhere. When she was at the shelter, she would call me crying in the middle of the night. She misses her kids. For almost a whole year, it was just her and her baby together. Now, she barely gets to see any of them. It's hard for

her to not be there watching them grow up. I tell her, "keep doing the things you have to do, keep working at it, and you'll get to see them again." She's scared about how things are going to go, though. She feels stuck sometimes because she feels like she's been doing everything she can to make things right, but she's not sure if everything will be okay. Sometimes she loses hope, but when she remembers her kids, it motivates her. She talks to me about how much she wants to be there for them.

Her kids are her motivation to keep her on the right path. In the beginning of her case, I know Mariah was not doing what she was supposed to when she got on house arrest. But now, she always talks to her officer and her therapist. She was applying for jobs and doing more in school when she wasn't pregnant. She wants to get her GED. I tried to get her a job with me at Chuck E. Cheese but they can't accept her because of her ankle monitor and her case. I'll keep helping her look for a job. She's trying her best and showing progress. I can see her becoming more motivated and trying to figure out what she can do to help her case. The old Mariah wouldn't care about the rules of her bail, but now she really respects her curfew and knows she can't just go wherever. I see her changing.

I really don't want my sister to go to jail. If she did, I think it would really mess her up mentally. She already regrets what happened. From what I've seen when she had her kid, she's a great mom and she always did her best. If she goes to jail, what are the chances that she'll ever see her kids again? Her grandma is sick – how can Mariah see her if she's in prison? Mariah was also my main motivation. Everything I'm doing, all the things I do to try to be better in life, is for her. We wanted to live together and it's always been me and her, together. If she goes away, what am I going to do? I need her. Who am I going to turn to? The thought of her going to prison really hurts me.

Hands down, if I ever need anything, Mariah is always there for me – no questions asked. She even moved in with our dad because I missed her and asked her to. Things have always been stressful with our dad, but she helps me deal with it in better ways. I've also tried hard to do my best to be there for her. Sometimes we sit and talk about what we want to do in the future. I finally moved out of my dad's house and I'm living with my boyfriend and his family in the Bronx. My main goal right now is to work and save as much money as I can so my boyfriend and I can get an apartment, hopefully with two or three bedrooms, because I want Mariah to be able to stay with us if she needs to. I'll always be there for her, I'm not going to leave her. We want to live together, and take care of her kids.

It's hard for Mariah to believe that people are there for her, because a lot of people have let her down in the past. She has her guard up. But as she sees it over time, she believes it more. It's already getting better. I hope she knows she can always count on me for anything. Our aunt Yohanny too, and Darielly and her mom. We're all her family. Just because Mariah is going through this now, doesn't mean it won't get better in the future. She does everything for herself and her children. She knows the way to get them back and to keep them is to follow the rules and keep doing good.

Thank you for reading my letter,

Angielisa Jaquez

# EXHIBIT D

Honorable J. Paul Oetken
United States District Court Judge
Southern District of New York
40 Foley Square, Courtroom 706
New York, NY 10007


Dear Judge Oetken,


My name is Yohanny Jacquez and I am the aunt of Mariah Jacquez. Mariah is a good and optimistic person. She is also very attentive and caring, and always helps around the house. She likes to clean the house and will do anything you need her to. She will bring you food when you haven't been able to eat or if you need help with something. She has never been in trouble with the law until now and I think she is a very misunderstood person.

Mariah has a lot of trauma. She was held in ACS custody as a child and she lost her parents. She was hospitalized when she lived with me because she was going through a very difficult time. She was abused and depressed and had to be on medication. That has caused a lot of trauma that affected her so much.

Mariah just wants a chance to change her life for the better for her children. Her children are the most important thing in her life. She gives us money to take care of them and buys them milk when they need it. She wants a life where she can be reunited with her children one day. She wants to build a life and go back to school and work so she can be better for them. Everything she does is for them.

I've seen how very sorry she is for what she did. We all make mistakes, but she just wants a chance to make it right. She's disoriented right now, because she's in the shelter with fifteen women sleeping together. When she is sad or upset, people don't understand what is going on in her life or how she feels. It's hard to process what's happening to you or to improve in an environment like that. She can't work with her ankle bracelet; she tried to get a job but they don't accept her because of the case. It has been very hard for her to have to stay inside and not be able to work for her future.

I have seen a lot of change in her. She's much more focused now. It's not that she didn't care or wasn't worried about her future before, but recently I've seen her much more motivated to do better for her children. She stays calm and out of the streets – she doesn't get into trouble. She is afraid of not having her children and is doing everything she can.

Judge, I pray to God that you will give her one more chance. She just wants the opportunity to be with her children. She feels so bad about what she did and she wants to make it right. She is so sad that she can't be with them. We all love her very much.

Thank you for reading my letter.


Sincerely,

Yohanny Jacquez

# EXHIBIT E

Honorable J. Paul Oetken
United States District Court Judge
Southern District of New York
40 Foley Square, Courtroom 706
New York, NY 10007


Dear Judge Oetken:

My name is Darielly Rodriguez. I'm 23 years old and I live on E 170th Street in the Bronx with my boyfriend and his family. Mariah has been my best friend since 2016. We met because her baby's father, Michael, lived in my same building growing up.

When the two of them started dating, we hung out at Michael's apartment together. Mariah didn't like me at first, and I could tell she didn't have any female friends. I don't think she knew how to make them. After hanging at Michael's, she would come upstairs to me and my family's house. That's how our friendship started. I wasn't there with her during her past, but she's shared with me about her mother dying and how hard on her it was. How she felt about it, how she misses her. She had a lot of problems with her family. I didn't know exactly what it all was, but I knew enough to get the sense that she was struggling. Mariah needed a mother figure in her life. I really felt bad for her honestly. From that part on, I knew I had to be there for her. Since I'm older than her, I've tried to be like her bigger sister.

Honestly, Mariah never knew what love was until her child was born. She did everything for her baby, I was there. I convinced my mom to take her and the baby in, and they came to live with us. Me, my mom, my sister, we all did the best to provide for her and the baby. We took turns to babysit, to feed the baby, to help with money.  I had a job at the time so I could contribute. Our family was around and wanted to take care of her and the baby, but I think it was hard for her to see that after all she'd been through. She put herself down a lot. She didn't have any money of her own, and that stressed her out.

Mariah first told me what she did after the police came to her house. She told me she was embarrassed to say what happened, that she did something she regrets, but she felt like she had no choice. She felt stuck and lost. She told me someone was threatening her, and I guess that person put something on her mind that made her feel she had to do the video. She was scared this person could do something to hurt her. At the time, I was shocked and I was disappointed, but I understood it wasn't really her fault. She's the one that reported it herself because she wanted help. It was her baby, she loved him so much. She had no idea she was gonna be investigated, so she was scared after the police came to the house. Obviously, the consequences for her actions had to come.

At the beginning, when Mariah got the ankle bracelet, she was violating the conditions and she wasn't taking it seriously. A lot of people, including me, were getting mad at her and telling her to stop doing things that way. She was giving up on herself. We convinced her to stop having that mindset. I'd tell her, don't give up. You need to show them that you are a good person, you just made a mistake. From there, she started doing good. Now, she's been doing great. She's been very responsible with her case and always makes it back home before her curfew. She hasn't been getting into any trouble. Even though

she sees all her friends being young and going out, I see her taking the case very seriously. I know it sucks for her, but I'm proud of her.

Mariah just wants everything to be done and start over. She needs help getting a job, and she has people who can help her move forward. She lived with her dad and sister for a while, and it was good for her and her sister to reconnect. We talk every day, either texting, calling, or playing games on the phone. Her and my boyfriend are also best friends. Mariah knows she is always welcome with my family. My mom and sister love her, she's one of us. She knows she can talk to my mom about anything, she'll always be there. She's like a mother figure for her. Mariah has a lot of people that love her and want to help her.

She misses her kids a lot. They motivate her to do better. It's been really hard for her being away from them. Sometimes, she calls me crying about missing them. She's so young and still learning, and she told me she wants to be a different person for her kids. I just want everyone to remember that she was really young when she did this. People make mistakes and learn from them. It's been three years of having her ankle monitor and she's already been so restricted that I think it's been enough punishment for her to learn from. There's no reason for her to be in jail while she has three kids who need her.

All I want, all everyone wants, is for her freedom and to be back with her kids. She wants to start over, be a new person. She's been going through this for a long time now, and she's proven to herself and to all of us that she can be a better person. I want everyone to remember how she was during at the beginning of her case and then the progress she made after all those years. Her progress has been amazing. She was not like how she is today. She's about to be 22 and I think she has the mentality of an adult now. Her goal is to get her kids back – she still can have this future that she wants to have with her three children. She's a mother, at the end of the day, and no mother would ever want to lose her kids. Everybody makes mistakes, but it's about growing up after, and I think Mariah has. It's time for everyone to see the real her, not just what she did.


Thank you,

Darielly Rodriguez

# EXHIBIT F

**Applicant's Name:** Mariah Jaquez

**Interview Date:** 1/13/20

**Last School Attended:** Fanie Lou Hamer Freedom H.S.

**Age:** 18    1year out of school

**Background:** *We are going to ask you a series of questions to help us make a decision as to whether this program is a good fit for you. We want to help you achieve your educational and vocational training goals and these answers will help us in doing so. Please feel free to be open and honest, we are here to help.*

List 3 Strengths:

1. hard working
2. helpful
3. Puts in extra effort

List 3 Challenges:

1. temper
2. Math
3.

## Education

1. What was the last grade you completed in school? 10th Grade    10th/11th grade
2. Why did you leave school? Being pregnant
3. Why do you want to return to a school setting? Diploma to go to the army  son's future
4. What do you plan to do after you obtain your HSE (which is the new GED)? Wants to go to army

## Availability

5. Are you able to come to the program daily (Monday through Friday from 8:45am to 4pm) until the end of June?

   Yes (Move on)

   No (Why? Ask about schedule conflicts and prior commitments)

## Background Questions

**Disclaimer:** Please note that if you answer Yes to the next question, it does not automatically disqualify from you from participation in the program, so we want you to be honest?

6. Do you currently use any illegal substances or drink alcohol?

   c. Yes (**If Yes,** ask if this will interfere with participating in the program)
   d. No (Move on)

   Hookah Everyday

## Work Attitude

8. What have you been doing since you left school?
   Parenting

9. Who do you currently live with? Baby's Father + his Family ~~Brother~~

10. What responsibilities do you have at home? How do you help out at home?
Take care of baby / Chores

11. What time do you go to bed each night?
4am last night

12. What time do you normally get up in the morning?
7am

13. Will you be able to get up early enough to get here by 8:45am?
No problems

## Construction

14. Why do you want to do construction?
Likes idea of doing something new

15. Do you have any experience doing construction or any other physical labor?
No experience

16. Do you have any physical impairments or limitations that would stop you from standing up for long

periods of time or lifting 25 lbs.?

   a. Yes (ask what are they?)
   (b.) No (Move on)

## Attitude toward Peers

17. Do you like working in a group or alone?
Both · Depends on mood but rather a group

18. Have you ever worked as part of a team or as a group?

19. How do you feel about working with members of the opposite sex on the construction site?
Fine

20. What would you do if one of your classmates is talking and being disruptive, and you having trouble
paying attention and feel yourself getting upset, what would you do?

21. What would you do if you had to work with someone who you don't get along with?
Keep pushing Forward

## Money

*(Intro: let student know we pay a stipend for program participation and work)*

22. We pay a stipend for participating in the program. It is up to $200 every two weeks. Will that be
enough while you are in the program?  Yes

23. How do you support yourself? Babysit
upstairs from house

24. Everyone goes through a 30 day probation period and there is another 2 weeks before you will
receive a paycheck. If we can help with a metrocard and lunch, will you be able to maintain for that
period of time before you collect a check?

## Family

**25. Are you a parent?** Yes Son is 3 months
**If YES only,** Do you provide child support? N/A

**26.** How will you be able to juggle all your responsibilities (work, school, home) so you can still be able to keep your commitment to YouthBuild?
Has support

**27.** Who do we need to call in your family or network, when we ca~~~~~~~~~
    a. Write down name, address, and number.

## Future Goals

**28.** How will the YouthBuild program and your fellow students help you reach your career goals?
Help me stay off Streets
Focus

**29.** Where do you see yourself in 5 years?
Army i Marines i navy

**30.** Why should we choose you?
To better "myself"
Putting extra effort into program

**Grading Rubric    Score:_____**

1 – Not a good candidate
2 – Not a good candidate at this time
3 – Good candidate, 2 or more barriers
4 – Good candidate, potential barrier
5 – Excellent Candidate

| Applicant's Name: Miraha Jaquez | Interview Date: 1/13/2020 |
|---|---|
| Last School Attended: Feng Lou hammer h.S. | Age: 18 |

out of School for a year.

**Background:** *We are going to ask you a series of questions to help us make a decision as to whether this program is a good fit for you. We want to help you achieve your educational and vocational training goals and these answers will help us in doing so. Please feel free to be open and honest, we are here to help.*

List 3 Strengths:

1. Hardworking
2. Like to work/help others
3. Put in extra effort.

List 3 Challenges:

1. Temper
2. Math
3.

## Education

1. What was the last grade you completed in school? 9th had 10th 11th grade Classes.
2. Why did you leave school? Got pregnant.
3. Why do you want to return to a school setting? Want to get her dipolma to get the army
4. What do you plan to do after you obtain your HSE (which is the new GED)?

Want to join the army.

## Availability

5. Are you able to come to the program daily (Monday through Friday from 8:45am to 4pm) until the end of June?
   - (a) Yes (Move on) [circled]
   - b. No (Why? Ask about schedule conflicts and prior commitments) [crossed out]

## Background Questions

**Disclaimer:** Please note that if you answer Yes to the next question, it does not automatically disqualify from you from participation in the program, so we want you to be honest?

6. Do you currently use any illegal substances or drink alcohol?
   - c. Yes (**If Yes,** ask if this will interfere with participating in the program)
   - (d) No (Move on) [circled]

**If Yes,** let them know that drugs or alcohol are never allowed on school property.

[redacted] reasons?

## Work Attitude

8. What have you been doing since you left school?

Parenting.

9. Who do you currently live with? *Baby's daddy and his family.*

10. What responsibilities do you have at home? How do you help out at home?
*Doing chores, cleaning up.*

11. What time do you go to bed each night?
*N/A.*

12. What time do you normally get up in the morning?

13. Will you be able to get up early enough to get here by 8:45am?
*Wake up at 7:00am.*

## Construction

14. Why do you want to do construction?
*No*

15. Do you have any experience doing construction or any other physical labor?
*No*

16. Do you have any physical impairments or limitations that would stop you from standing up for long periods of time or lifting 25 lbs.?

    a.  Yes (ask what are they?)
    (b.)  No (Move on)

## Attitude toward Peers

17. Do you like working in a group or alone? *Both group or alone.*

18. Have you ever worked as part of a team or as a group?

19. How do you feel about working with members of the opposite sex on the construction site?

20. What would you do if one of your classmates is talking and being disruptive, and you having trouble paying attention and feel yourself getting upset, what would you do?

21. What would you do if you had to work with someone who you don't get along with?

## Money

*(Intro: let student know we pay a stipend for program participation and work)*

22. We pay a stipend for participating in the program. It is up to $200 every two weeks. Will that be enough while you are in the program? *Yes.*

23. How do you support yourself? *Babysit.*

24. Everyone goes through a 30 day probation period and there is another 2 weeks before you will receive a paycheck. If we can help with a metrocard and lunch, will you be able to maintain for that period of time before you collect a check? *Yes.*

## Family

25. Are you a parent? *Yes*
    **If YES only,** Do you provide child support?

26. How will you be able to juggle all your responsibilities (work, school, home) so you can still be able
    to keep your commitment to YouthBuild? *I just wanna do it for*
    *my son.*

27. Who do we need to call in your family o
    a. Write down name, address, and r

## Future Goals

28. How will the YouthBuild program and your fellow students help you reach your career goals?
    *Allow her to stay off the streets.*

29. Where do you see yourself in 5 years?
    *Be in the Army.*

30. Why should we choose you? *))*
    *To better herself.*

**Grading Rubric    Score:** *putting extra effort in.*

1 – Not a good candidate
2 – Not a good candidate at this time
3 – Good candidate, 2 or more barriers
4 – Good candidate, potential barrier
5 – Excellent Candidate

# EXHIBIT G

Honorable J. Paul Oetken
United States District Court Judge
Southern District of New York
40 Foley Square, Courtroom 706
New York, NY 10007

Dear Judge Oetken,

I, Dionely Lopez, I can say that Mariah Jaquez is a wonderful person. She is my daughter
Darielly's best friend – I see her as another daughter for me, and Mariah sees me like a mother.
She is a genuine person and tends to put others before herself. She lived with us for two years
and she was part of the family. She was very responsible and always helped us cook, clean, and
do the laundry. She was so helpful to have around and we never had any problems with her.

Mariah is also a great mom and she adores her children. She always tells me how much she
wants to be with them and how much she misses them. I remind her that she needs to be patient
and it will work out, but I know it's very hard for her to not be with her kids. She's told me how
she always feels like she's losing time with them and missing out on an important part of their
lives. One of the most difficult things Mariah ever went through was when her mom died.
Mariah was young and never had a stable place to live after that. Now, she tells me how much
she wants to be stable for her own children.

During the years of her case, there have been many times when we wanted to be with Mariah,
but she couldn't come over because of the restrictions she has been under. We'll get together as a
family for Thanksgiving, Christmas, birthdays, or other occasions, and Mariah can't leave
because of her curfew. There have been times where I think she feels very lonely because she
can't share those days with us.

Mariah doesn't need to go to jail because she is not a problem for society. She isn't looking for
trouble, she isn't a threat to anyone, she can be out on the street without any issues. She's
someone who is friendly and who is calmer now. She has already paid the price for what she did,
and she has a good future ahead of her. She has grown up a lot and just wants to work and be

with her kids. I work as a home attendant and also at Applebee's. She hasn't been able to work with an ankle monitor, but once she gets confirmation that she can work, she's asked me to get her a job there.

We all make mistakes, but I believe Mariah deserves another chance. We all love her so much, like a daughter, and we want to see her doing well. We want to be with her. At the time she was in my house, she felt so happy being surrounded by us. We had, and are looking forward to having, an amazing time together. So many amazing memories happened in just one year with Mariah. We hope to God that we get good news on the day of her sentencing. We love her so much, and we are praying that she gets out of this situation.

Sincerely,
Dionely Lopez

# EXHIBIT H

Rebecca Dell
Assistant United States Attorney
Southern District of New York
One Saint Andrew's Plaza
New York, NY 10007

February 7, 2022

Dear Ms. Dell,

      My name is Rachel Rapps, and I am a social work intern at the Federal Defenders of New York, Southern District. I work alongside Mariah Jaquez's legal team and under the clinical supervision of Angel Bosques, LCSW. Mariah and I have been working together since October 2021 for emotional support and case management. We have met for regular sessions over the phone. Mariah has used our sessions for emotional support as well as to reflect on her future goals. This letter provides an overview of our work together and outlines Mariah's efforts to create a brighter future for herself.

      From our earliest sessions together, Mariah was receptive to social work support. She opened up about her background and current concerns. Mariah expressed wanting to use our sessions for emotional support and for guidance with obtaining employment. We focused on identifying Mariah's strengths and navigating her pregnancy and related physical, social, and emotional complexities. Mariah has been vocal about finding employment in order to attain more stable housing and to be able to provide for her future child.

      In our work together, Mariah has shown herself to be motivated, resilient, and caring. Mariah has been diligent about maintaining weekly check-ins with her therapist and pretrial officer and attending her prenatal appointments. She is holding herself accountable and taking steps towards positive changes in her life. Despite all the challenges she's faced, Mariah has a great sense of humor and a kind spirit. Mariah cares deeply about the people around her. Since the death of her mother, Mariah has become a caretaker for her younger sibling-- a position Mariah sincerely values. Mariah hopes to join the army, giving her an opportunity to give back to others. She dreams of one day becoming a nurse, a career that aligns with her devotion to helping others. In 2019 and 2020, Mariah was involved with the Youth Build Construction Skills program, which provides vocational skills training for youth. Mariah works tirelessly towards bettering herself and caring for those close to her.

      Mariah is focused on the future. She is searching for stable employment, and understands the importance of attaining a GED to aid in the process. She was unable to complete her high school education following her mother's tragic death and lacking any adult support. Following her mother's death, Mariah engaged in erratic and dangerous behaviors, consistent with her long history of overlapping childhood traumas and history of mental illness. She struggles with

emotional dysregulation, which contributed to her inability to graduate. Nevertheless, Mariah has proven resilient, motivated, and eager to start a new chapter of her life on a more stable path.

As aforementioned, Mariah works every day to strive for a brighter future for herself and her family. She does this by engaging in weekly meetings with a therapist, regular check-ins with a psychiatrist, and by taking care of her family. She engages in sessions with myself weekly, always putting in effort to do the emotional work to get her to a better place. Mariah is open during our sessions, and is willing to discuss hard topics. Together, we have identified Mariah's strengths and supportive factors. Mariah has shared her desire to reconnect with her son and is interested in pursuing parenting classes. Mariah is committed to taking better care of herself to ensure a stable future for herself and her loved ones.

Throughout this case, Mariah has remained determined to change the trajectory of her life. She continues to work through her trauma with mental health counselors to maintain better emotional health. Mariah also works towards her goals of being able to better provide for her family and continue her academic career. Mariah is a strong family-oriented woman who will work hard in order to create a better life for herself.

Respectfully Signed,

Rachel Rapps
Social Work Intern
Federal Defenders of New York, Southern District
52 Duane Street, 10th Floor New York, NY 10007
(908) 460-6288
rachel_rapps@fd.org

# EXHIBIT I

Honorable J. Paul Oetken
United States District Court Judge
Southern District of New York
40 Foley Square, Courtroom 706
New York, NY 10007


Dear Judge Oetken,

My name is Angel Medina and I met Mariah because she was my brother's girlfriend. They
have two babies together, a girl and a boy. Even though they're not together anymore, our
relationship has been good ever since I met Mariah.

Mariah's got a great personality. She has a lot of feelings and really cares about other
people. She's always trying to help her friends. She used to live at my house with me in
Providence, Rhode Island, until her pretrial officer told her she had to move back closer to
the court in New York. I was trying to keep her out of the Bronx, because I think the Bronx
is bad for everybody. A lot of things happen over there, so I tried to keep her here so she
could be away from those people. It's more calm down here and Mariah liked that.

She's also a great mom. Ever since I met her and she had her first baby (which wasn't my
brother's son), she was always seeing him and calling his dad every day. If she has any
money, she always sends it to her kids. Whenever I'm in the Bronx, I go see her babies and
see how she's doing. With my brother's son, they gave her a day she could go see him and
she was always there on time to visit. She didn't go see him unless they told her she could –
if they say she can't be around him, she follows that. She's been following the rules and
doing what she's supposed to do because she takes this case seriously. She's always at home
when I call her, she's not going out, she's always on time. She listens to me and talks to me
whenever she has problems, because she knows I want the best for her.

I want her to get her babies back. I know this situation isn't good for her. It's important for
her to stay with her kids and out of jail. Every mom wants to be with their babies, and
Mariah is scared because she doesn't want to be away from them like that. Jail would drive
her crazy because she would be away from them – I think it would really hurt her. But she
has faith that she'll get through this. She knows she's not doing anything she's not
supposed to do, so she thinks she will be okay. She can't wait to take off the ankle monitor
and spend more time with her babies.

Mariah wants a new life, a better life. In the future, she wants to work a full time job doing
something she likes. When she was with me, I got her a job at UPS that she worked most of
the time she was in Rhode Island. She wants to be somewhere where she feels like she can
do better for her kids. I drive trucks, so I'm on the phone with her almost every day, and

she always talks to me about that. She's always welcome in my house because I know she's a good person.

I think she deserves a second chance. She's been doing what she's supposed to be doing and following the rules so she can be with her children. She's trying to be there for them. Thank you for reading my letter, Judge.


Sincerely,

Angel Medina

# EXHIBIT J

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

Hon. Judge J. Paul Oetken
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

August 18, 2023

Re:     United States v Mariah Jaquez
        21 Cr 190 (JPO)

Dear Judge Oetken:

I am a New York State-licensed clinical social worker and have worked at Federal Defenders since 2014. Our Client and Mitigation Services Department works with clients to provide support during incarceration and reentry and to identify areas of need and appropriate community resources.  I write to provide information about Mariah Jaquez's efforts during her case to abide by the rules of supervision, address her mental health and substance use needs and to describe how Mariah, with support from our office and the Probation Department, may continue with these efforts without a period of incarceration.

## Complex Trauma and the search for security

Mariah lacked basic emotional care, stability, and psychological safety as a child and adolescent. Nevertheless, while still a child herself, she attempted to care for those around her and set her sights on completing high school and entering into a stable career.  Her mother's death and her first pregnancy created additional obstacles to her goals. As a new mother facing financial desperation, she made a poor decision and was instantly remorseful.

A testament to her positive goals and lack of dangerousness, over the past three years Mariah has made herculean efforts to comply with supervision and transition toward adulthood. She has attempted to follow the many rules of federal supervision and family court including programming and living away from her beloved children.  She has engaged in treatment and school programming and reduced her substance use.  Avoiding marijuana was difficult because it served as a coping strategy to manage the effects of her significant

trauma history, but she has tested negative for years now.[1] Mariah also worked briefly while living in Rhode Island. Location monitoring has not been easy to navigate and made it difficult to get a job.

At times she made progress, other times she has struggled to show up to appointments, respond to supervising officers and advocates and engage in new programs and apply for new benefits.  When Mariah is overwhelmed, she retreats into isolation, an act of control when everything feels outside of her control.  One day she told me she didn't want to speak to anyone, "even Ian," a constant presence throughout her case. Throughout Mariah's ups and downs, her psychological and cognitive limitations and poverty and material hardship are constant.



**<u>Need for consistent trauma-informed supports</u>**

---

[1] Research shows coping/self-medication and escaping insecure households are two primary pathways to substance use and legal involvement for women who have experienced trauma in childhood, measured as Adverse Childhood Experiences. In Boppre, B., Boyer, C. (2019). "The Traps Started During My Childhood": The Role of Substance Abuse in Women's Responses to Adverse Childhood Experiences (ACEs). Journal of Aggression, Maltreament and Trauma 1-22. http://dx.doi.org/10.1080/10926771.2019.1651808

[2] Crosby, S. D., Day, A., Baroni, B. A., & Somers, C. (2019). Examining trauma-informed teaching and the trauma symptomatology of court-involved girls. *The Urban Review*, *51*, 582-598.

[3] For violence-exposed girls, dysfunctional internal ER [emotional regulation] strategies such as self-criticism and emotion suppression may maintain and contribute to perceived NVC [neighborhood violence and crime] -linked PTSD symptoms such as emotional numbing, self-blame, and avoidance" in Sun S, Crooks N, DiClemente RJ, Sales JM. Perceived neighborhood violence and crime, emotion regulation, and PTSD symptoms among justice-involved, urban African-American adolescent girls. Psychol Trauma. 2020 Sep;12(6):593-598. doi: 10.1037/tra0000562. Epub 2020 Apr 2. PMID: 32237877; PMCID: PMC8324004.

███████████████████████████████████

Sometimes Mariah struggled to recall the names of the various people at legal agencies and supervision agencies she is engaged with. Keeping track of over fifteen officers, advocates, case workers, and treatment providers (who would often change due to staff turnover) would be a challenging and intellectually demanding task for an emotionally mature, well-resourced adult. For Mariah: developmentally still an adolescent, struggling with her trauma history, often experiencing food and housing insecurity, barred from her family after a misguided effort to protect them, the administrative tasks felt onerous and demoralizing. When she struggled to stay on top of things, she felt like a failure which exacerbated her depressive symptoms and further limited her ability to respond proactively. "I have a mood disorder, I get angry or overwhelmed. I don't get along with people." She knows she needs help and wants to receive the right treatment.

Changes in mental health treatment providers were especially difficult for Mariah. Building trust and rapport with a therapist or psychologist is paramount to the treatment process and a necessary step before cognitive, emotional or behavioral progress. Mariah engaged and built a trusting relationship with a counselor named Mari at the NY Mental Health Group. Together they were actively working on new strategies to deal with stress and depressive symptoms besides isolation and shame. Over the past three years, sometimes due to her housing instability and sometimes for reasons outside her control Mariah has worked with many providers, which is less than ideal. Mariah has found it discouraging and difficult to engage with a new provider - in some ways it mimicked the abandonment she experienced with her parents. It also required her to disclose her trauma history again and again, which has been shown to be re-traumatizing - instead of progress, it is an additional traumatic experience.

Federal agencies and human service providers and increasingly implementing trauma informed models - it meets peoples' treatment needs, decreases recidivism, and keeps the community safe.[5]

---

[4] In the juvenile justice system, the majority of female juvenile adjudication and detention occur as a result of status offenses (e.g., curfew violations, truancy, runaway behavior) and probation violations, rather than the serious violent crimes more commonly committed by young men. Often times, these behaviors stem from previous trauma and victimization," In Crosby, S. D., Day, A., Baroni, B. A., & Somers, C. (2019). Examining trauma-informed teaching and the trauma symptomatology of court-involved girls. *The Urban Review*, *51*, 582-598.

[5] "Trauma-informed care is an approach used to engage people with histories of trauma. It recognizes the presence of trauma symptoms and acknowledges the role that trauma can play in people's lives. Trauma-informed criminal justice responses can help to avoid re-traumatizing individuals. This increases safety for all, decreases the chance of an individual returning to criminal behavior, and supports the recovery of justice-involved women and men with serious mental illness," from Trauma Training for Criminal Justice Professionals. Substance Abuse and Mental Health Services Administration SAMHSA's GAINS Center for Behavioral Health and Justice

**Continued progress in the community, continued support needed**

Over the past three years, Mariah has proven that she wants to be a law-abiding citizen. She desperately wants to earn her GED and find a career pathway. She wants to be a loving and involved mother - hopefully one day living with her children, but for now, with regularly supervised visits in accordance with ACS protocols.  To continue to progress, Mariah needs consistent mental health treatment with a trusted provider.  Incarceration would only serve to create another barrier for a young woman who has encountered more than her share.

Mariah is very remorseful. Lacking secure attachment to her own caregivers, she dreams of showing her children the love, care, and stability that she and her siblings lacked. If not for the direct threat to her and her family's wellbeing, it is unimaginable that Mariah would ever cause harm to her children. She has been punished by the enduring shame of placing her child in danger while trying to protect herself and her child.

Currently, Mariah is living alone in a shelter, away from her three children. Despite her lack of financial resources and ongoing mental health symptoms, Mariah is trying to avail herself of resources and opportunities.  At first, she could not fathom entering the shelter system.  She begged us for the chance to live with her younger children's father. Heartbroken, frustrated, and at a loss, she continued to comply with conditions of supervision, sleeping in a car, always trying to keep her pretrial officer informed of her whereabouts. Eventually, with enough support, she was able to take the step that was best for her and her children, entering the shelter system.  Hopefully, she will be able to access stable long-term housing through a voucher program. She has also voluntarily signed up for sex offender treatment through the family court, in the hopes it will allow her to reunite with her children as soon as she is deemed fit to parent.

Incarceration would be another traumatic experience for Mariah to endure. She has a newborn baby girl, and she is able to be with her often due to a liberal visitation policy set by ACS. It is clear she will never engage in behavior like this again.  Instead of imprisonment she needs robust and continued support in the community. Stable housing, ongoing mental health treatment and education and vocational support in the community would afford Mariah the opportunity to continue to make progress towards stability and safety, for her and her family.  Federal Defenders and U.S. Probation can coordinate to support Mariah throughout the process.

Respectfully submitted,

_____/s/_____
Brittany Larson, LCSW
Client and Mitigation Services

Transformation. Available at https://www.samhsa.gov/gains-center/trauma-training-criminal-justice-professionals

Federal Defenders of NY

# EXHIBIT K

Honorable J. Paul Oetken
United States District Judge
Southern District of New York

Date: August 24, 2023

Honorable Judge Oetken,

My name is Kaitlyn Hartmann, and I'm a supervising attorney in the Family Defense Practice at
the Bronx Defenders. I'm currently assigned to represent Ms. Mariah Jaquez in the proceedings in
Bronx Family Court related to the care and custody of her children. I have known Ms. Jaquez since
I began representing her in Bronx Family Court on April 26, 2022. Since then, I have spent a lot
of time getting to know Ms. Jaquez and learning about her personal history, family history, and
her hopes for her future.

I have been a family defense attorney at the Bronx Defenders for about five years now and have
represented and advised hundreds of parents charged with abuse and neglect. However, very few
of my clients have experienced the same degree of hardship for such a significant portion of their
life as Ms. Jaquez.

Upon being assigned to represent Ms. Jaquez, I was struck by the fact that she was only 18 years
old when she became a mother for the first time. As I got to know Ms. Jaquez, I learned about the
trauma she had faced as a child. She spent years enmeshed in the child welfare system living in
various homes without much stability and without a parent who was a consistent positive presence
in her life. Ms. Jaquez could not rely on her parents to be there for her in moments of stress,
sadness, or pain. To me, there is no way this lack of a consistent secure home did not impact her
processing and decision-making abilities as a young adult. While I'm not a clinician, having done
this work for several years now, I'm frequently confronted with the unfortunate reality that a good
number of the parents I represent were once children in foster care themselves and began their
adult lives without any real support from a reliable caregiver. The inconsistent supervision
afforded by various foster home placements cannot replace the human need to feel strongly
connected to a parental figure, who is also typically the primary model of how to be a caregiver.
Ms. Jaquez's childhood in foster care and the traumas she faced over the course of her childhood

should be considered as important context for understanding how this case came to be when Ms. Jaquez was a very young, first-time mother.

After meeting Ms. Jaquez, I was also struck by the discord between the charges on paper and the person I got to know as Ms. Jaquez. From our first conversation it was clear that her children and their wellbeing was her primary focus. In that conversation Ms. Jaquez told me that she wanted to show the Judge that she was a loving mom who made a serious error for which she knew she would carry deep regret for the rest of her life. Ms. Jaquez has consistently reiterated to me that she wishes she could change the past but knows that she must focus on the present and show that her focus is her children's happiness and safety.

From the start of her family court case Ms. Jaquez has been open to the recommendations of the Court and her case workers from the Administration for Children's Services ("ACS") about what services they wanted her to engage in. Ms. Jaquez readily agreed to continue to engage in individual counseling and to openly discuss the issues underlying both the federal and family court matters. Ms. Jaquez chose not to exercise her right to a trial in her family court case. Instead, Ms. Jaquez decided to voluntarily submit to the jurisdiction of the Court and allowed the Court to make a finding of abuse against her. Ms. Jaquez also agreed to an order that she engage in sex offender counseling. I think that all of this demonstrates that Ms. Jaquez has taken accountability for her actions and has insight into the issues in her cases. She is genuinely committed to doing what is necessary to address the concerns in her cases.

Ms. Jaquez always talks about her children and how much she loves them. She is always eager to take advantage of her supervised visitation with her children and celebrate their milestones. It is incredibly important to note that since ACS filed a case against Ms. Jaquez on April 26, 2022, no ACS worker or visit supervisor has raised a single concern about Ms. Jaquez's interactions with her children. Ms. Jaquez recently gave birth to a baby girl. On August 1, 2023, an ACS caseworker testified under oath that she observed Ms. Jaquez with her newborn in the hospital and had no concerns about how Ms. Jaquez cared for her and neither did the Jacobi hospital staff who treated Ms. Jaquez and her newborn. I think this speaks volumes about who Ms. Jaquez is *now* as a person and a parent.

I hope Your Honor will allow Ms. Jaquez to stay in the community so that Ms. Jaquez can continue to parent her newborn under the supervision of ACS. Ms. Jaquez is permitted the orders of the Bronx Family Court to have liberal visitation with her newborn supervised by her family members who have been cleared by ACS. This allows Ms. Jaquez to bond with her newborn baby by nursing

and caring for her in a way that the Court believes is safe. Your Honor has the chance to break a cycle here by allowing Ms. Jaquez to be a present parent for her very young children under the supervision of her ACS caseworker, visit supervisors, and the Bronx Family Court. If Ms. Jaquez remains in the community, she can continue to take part in her sex offender treatment services and individual counseling as well as any other services ACS recommends for her. Ms. Jaquez's engagement in these services is integral to fulfilling ACS' expectations of her in the family court case. Due to the ACS cases, Ms. Jaquez is on the New York State Central Register for Child Abuse and Maltreatment. Under the Social Services Law, the State Central Register must disclose to certain types of employers whether a person is named on the register. Employers for jobs working with children and other vulnerable communities, such as the elderly and disabled, are required by law to check the New York State Central Register for Child Abuse and Maltreatment before employing a person or granting them certain licensures. Ms. Jaquez's name will be disclosed to any employer required to conduct this check. This means that while Ms. Jaquez is in the community, there are already legal guards in place requiring relevant employers to be made aware of Ms. Jaquez's ACS history.

One of Ms. Jaquez's hopes for her future is to obtain her own housing so that she lives a stable and productive life, different from that of her childhood. Ms. Jaquez has taken significant strides toward this already. Ms. Jaquez has applied for stable long-term housing through Jericho Project. Jericho Project also has an employment and education program where career counselors can support the Jericho Project members in identifying and securing employment if needed. Ms. Jaquez has told me that she is looking forward to taking advantage of Jericho Projects programs to set herself up for a good future.  If Ms. Jaquez remains in the community, she will have the chance to continue to seek long-term stable housing of her own through Jericho Project and benefit from their other programs as well.

I'm very proud of Ms. Jaquez and the steps she has taken to improve her life in the sixteen months that I've known her. She is one of the most resilient clients I have ever worked with. It is hard to imagine what she has been through in her young life, but I find it very easy to imagine the positive path she will be on as she continues into adulthood because she's already on it. I hope that Your Honor considers my letter in sentencing Ms. Jaquez and recognizes that she has grown in her insight immensely.

Respectfully,

Kaitlyn Hartmann, Esq.

Supervising Attorney, Family Defense Practice The Bronx Defenders

347-946-1903

kaitlynh@bronxdefenders.org

# EXHIBIT L

**Defendants sentenced to Probation or Time Served in the SDNY after <u>United States v. Dorvee</u>, 616 F.3d 174 (2d Cir. 2010) was decided.**

|    | Date Sent. | Case Number | Case Name |
|----|------------|-------------|-----------|
| 1  | 02/01/11 | 10 Cr 341 (SHS) | US v. Santana |
| 2  | 03/02/11 | 09 Cr 678 (RJS) | US v. Jin |
| 3  | 03/01/12 | 08 Cr 674 (LAP) | US v. Genin |
| 4  | 03/05/12 | 11 Cr 939 (RPP) | US v. Ressa |
| 5  | 09/18/12 | 10 Cr 914 (BSJ) | US v. Garcia |
| 6  | 09/20/12 | 11 Cr 1114 (VLB) | US v. Spellman |
| 7  | 10/02/12 | 11 Cr 427 (DAB) | US v. Morel-Baca |
| 8  | 05/22/13 | 12 Cr 462 (VLB) | US v. Colon |
| 9  | 03/17/14 | 14 Cr 180 (ALC) | US v. Angeles |
| 10 | 05/29/14 | 11 Cr 455 (VM) | US v. Kato |
| 11 | 04/10/15 | 14 Cr 341 (AJN) | US v. Pinero |
| 12 | 06/25/15 | 14 Cr 547 (NRB) | US v. Trinidaf |
| 13 | 08/21/15 | 14 Cr 475 (RA) | US v. Galicia |
| 14 | 12/05/15 | 14 Cr 370 (PKC) | US v. Ryan |
| 15 | 02/08/16 | 14 Cr 660 (KMW) | US v. Colon |
| 16 | 02/24/16 | 12 Cr 305 (LAP) | US v. Burgoa-Hernandez |
| 17 | 02/25/16 | 12 Cr 39 (KBF) | US v. Ramirez |
| 18 | 11/04/16 | 14 Cr 183 (JGK) | US v. Meyer |
| 19 | 12/07/16 | 16 Cr 211 (PAE) | US v. Gonzalez |
| 20 | 01/10/17 | 14 Cr 432 (JPO) | US v. Rivera Gallegos |
| 21 | 04/05/17 | 16 Cr 565 (CS) | US v. Sauer |
| 22 | 06/29/17 | 17 Cr 370 (PAC) | US v. Duffy |
| 23 | 09/19/17 | 16 Cr 765 (JGK) | US v. Gabriel |
| 24 | 09/24/18 | 17 Cr 532 (PAE) | US v. Garcia |
| 25 | 02/08/19 | 17 Cr 790 (RA) | US v. Bowie |
| 26 | 07/22/19 | 19 Cr 51 (RMB) | US v. Lorber |
| 27 | 09/06/19 | 17 Cr 502 (RA) | US v. Richardson |
| 28 | 01/06/20 | 17 Cr 207 (ALC) | US v. Flores |
| 29 | 03/24/21 | 19 Cr 749 (JPO) | US v. Sprecher |
| 30 | 06/03/21 | 19 Cr 793 (JMF) | US v. Garcia |
| 31 | 12/21/21 | 19 Cr 97 (JSR) | US v. Hernandez |
| 32 | 02/15/22 | 21 Cr 583 (DLC) | US v. Turner |
| 33 | 10/19/22 | 20 Cr 525 (JPO) | US v. Corbett |
| 34 | 11/07/22 | 22 Cr 101 (JMF) | US v. Vieser |
| 35 | 12/02/22 | 21 Cr 693 (JSR) | US v. Belitz |
| 36 | 03/28/23 | 21 Cr 186 (JPO) | US v. Vega |